Alexander M. Vasilescu
vasilescua@sec.gov
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1100

Gregory A. Kasper
kasperg@sec.gov
Terry R. Miller
millerte@sec.gov
James A. Scoggins, II
scogginsj@sec.gov
Stephen C. McKenna
mckennas@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>LAWRENCE F. CLUFF, JR. and ROGER E. SHAOUL,<br><br>Defendants. | 17-cv-2460-RMB<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>**ECF CASE** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its First

Amended Complaint against defendants Lawrence F. Cluff, Jr. and Roger E. Shaoul

(collectively, "Defendants"), alleges as follows:

## <u>SUMMARY</u>

1.      This is an insider trading case based on highly suspicious and profitable trading by

Defendants in the securities of Mobileye, N.V. ("Mobileye"), a Netherlands company based in

Israel and traded on the New York Stock Exchange. Defendants took large positions in Mobileye securities shortly before Intel Corporation ("Intel") announced its agreement to acquire Mobileye by tender offer. The deal was announced before trading opened on March 13, 2017 ("Announcement"). Following the Announcement, Mobileye's share price increased 28 percent to $60.62 by the close of trading that day. Defendants' trading in Mobileye resulted in combined realized and unrealized profits of over $925,000.

2.      Shaoul received inside information about Mobileye securities from his brother, referred to as "Brother A" in this Complaint. Brother A has professional and personal relationships with Mobileye insiders, including the founders of Mobileye who directly participated in the negotiations that resulted in the tender offer. Shaoul then disclosed this inside information to Cluff, explaining among other things that Shaoul's family knew the founders of Mobileye and that the Mobileye founders recommended that their friends and family invest in Mobileye.

3.      This case is related to SEC v. Ariel Darvasi and Amir Waldman, Civil Action No. 17-CV-02088-RMB (S.D.N.Y.), where the Commission obtained an asset freeze and other relief based on allegations of insider trading in Mobileye securities prior to the Announcement.

**NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF**

4.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to

Section 21A of the Exchange Act [15 U.S.C. § 78u-l].  The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

6.      Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  Mobileye stock is traded on the New York Stock Exchange and the purchases in Cluff's accounts described below were executed on a number of different U.S.-based stock exchanges, including exchanges located in Manhattan, New York. The exchanges through which the stocks were traded include XPHO, ARCA, MPRL, BATS, OTC, CBSX, XNDQ, GMNI, XBOX, C2OX.  At least four of these exchanges – XNDQ, NYSE ARCA, and ISE Gemini – are located in Manhattan.

## DEFENDANTS

7.      **Defendant Lawrence F. Cluff, Jr.** is a resident of Richmond, Virginia.  He is the owner of Quality Home Construction & Investments, LLC and Commonwealth Foam Insulation.

8.      **Defendant Roger E. Shaoul** is an Israeli citizen and resides in Richmond, Virginia.

# FACTS

## Intel's Announced Acquisition of Mobileye

9.      Mobileye is a Netherlands entity with its principal offices in Jerusalem, Israel. Mobileye is a software and technology developer for Advanced Driver Assistance Systems used for autonomous driving.  Members of the Hebrew University of Jerusalem ("HUJI") science community developed and commercialized Mobileye's technology.  Numerous current Mobileye directors and officers are members of the HUJI science community.  Mobileye's securities are registered under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the ticker symbol MBLY.

10.      Mobileye directors owe fiduciary duties to Mobileye and its shareholders, including fiduciary duties imposed by Dutch law.

11.      Intel is a Santa Clara, California based technology company.

12.      Intel expressed an interest in acquiring Mobileye as early as November 2016, and formal discussions with Mobileye began in late January 2017.  Principals of the two companies met in New York on or about January 27, 2017, to discuss a price per share in a transaction providing for the acquisition of 100% of Mobileye's shares as well as a timeline for the transaction.  Mobileye's co-founders and directors, referred to in this Complaint as Director A and Director B, who are both citizens and residents of Israel, attended this meeting.

13.      On or about January 30, 2017, certain members of Mobileye's board discussed a potential transaction price, and by the following day, all members of Mobileye's board learned of the potential transaction.

14.      The two companies executed a non-disclosure agreement on or about February 1, 2017, which was signed by Directors A and B on behalf of Mobileye.  Among other things, the

parties to this agreement acknowledged and agreed to advise their representatives who were informed of the pending transaction of the United States securities laws that restrict the purchase or sale of securities by a person who has received material nonpublic information from the issuer of such securities and that restrict the communication of material nonpublic information to any other person when it is "reasonably foreseeable" that such other person is likely to purchase or sell such securities based on the information.

15.    The two companies held the first meetings that included outside legal and financial advisers on or about February 9, 2017.

16.    From February 24-26, 2017, representatives of both companies held meetings in New York to negotiate the remaining issues between the parties and exchanged drafts of a purchase agreement.   Directors A and B attended these meetings.

17.    Intel executed a definitive agreement with Mobileye on Sunday, March 12, 2017 ("Definitive Agreement"), under which Intel would buy Mobileye for approximately $15.3 billion, or $63.54 per share, through a tender offer.  The deal was publically announced shortly before the market opened for trading on Monday, March 13, 2017.  The announced purchase price was a 34.4% premium over Mobileye's Friday, March 10, 2017, closing price of $47.27 per share.  After the Announcement, Mobileye opened on Monday, March 13, 2017, at its high for the day, $61.51, and closed at $60.62 per share, a 28 percent increase over its March 10 closing price.

### Defendants' Trading In Mobileye Shares

18.    Defendants began trading in Mobileye securities abruptly after Intel and Mobileye began formal discussions in late January 2017.  They worked together to trade on inside information in two brokerage accounts opened in Cluff's name at optionsXpress, Inc. ("OX"),

described below as the "4866 Account" and the "1784 Account". They earned a return of 488%

trading Mobileye shares in the six weeks prior to the Announcement on March 13, 2017.

**A. Defendants Opened the Account 1784 on January 29, 2017 to Trade in Mobileye.**

19.     Shaoul asked Cluff to open a new trading account during a conversation that

occurred on or about January 28 or 29, 2017.  During the conversation, Shaoul told Cluff that

Shaoul could not open his own account due to his "status."  Cluff agreed to open the new

account.

20.     During the same conversation on or about January 28 or 29, Shaoul also

suggested to Cluff that he invest in Mobileye based on inside information.  Shaoul told Cluff that

Shaoul's family knew the principals of Mobileye and that the principals of Mobileye

recommended that all their friends and family invest in Mobileye.

21.     Cluff had never heard of Mobileye until Shaoul provided Cluff with the tip to

purchase Mobileye securities.

22.     Shaoul repeatedly encouraged Cluff to open and fund the account following the

conversation in which Cluff agreed to open a separate trading account.

23.     On Sunday, January 29, 2017, Cluff submitted the application to open the new

trading account, around the same time that Intel and Mobileye began formal discussions.

24.     On Monday, January 30, 2017, Shaoul visited a Wells Fargo branch office and

withdrew a total of $161,500 from three accounts, as follows:

> a.     $36,000 from a personal checking account in Shaoul's name.  The
>
> account's ending balance on January 30 was $4,869.70.
>
> b.     $102,500 from a checking account in the name of "QHCI D&R
>
> Investments LLC."  According to the records of Wells Fargo, QHCI D&R

Investments LLC is the sole owner of the account, Cluff's position with respect to QHCI D&R Investments LLC is "owner," and Shaoul's position with respect to QHCI D&R Investments LLC is "Leasing Agent," not an owner, although he did have permission to make withdrawals from the account.  The account's ending balance on January 30 was $1,805.65.

    c.   $23,000 from a checking account in the name of "Larry Franklin Cluff Jr., DBA D & R Lawn Maintenance."  According to the records of Wells Fargo, "D & R Lawn Maintenance" is a sole proprietorship owned by Cluff.  Wells Fargo records show that Shaoul is a "Leasing Agent" of "D & R Lawn Maintenance," not an owner, although he did have permission to make withdrawals from the account.  The account's ending balance on January 30 was $2,058.53.

25.    Notwithstanding the fact that Wells Fargo records show that Shaoul does not own the checking accounts in the names of QHCI D&R Investments LLC and Larry Franklin Cluff Jr., DBA D & R Lawn Maintenance, the money withdrawn by Shaoul on January 30 was the property of Shaoul.

26.    On the same day, January 30, Shaoul deposited the $161,500 in Cluff's personal SunTrust Account.

27.    On February 1, 2017, Cluff funded the new 1784 Account by transferring $161,500 from his personal SunTrust Account into the 1784 Account.

28.    The new account has since served a single purpose – trading in Mobileye securities.  The first trade occurred on February 1.  On the same date that the funds became available in the 1784 Account, all but $80 of that money was used to purchase 3,782 Mobileye

shares at a cost of $161,421.68. Cluff made the purchase at the direction of Shaoul.

29.     On February 15, 2017, Shaoul made a deposit to the Wells Fargo checking account owned by QHCI D&R Investments LLC in the amount of $36,670. The source of these funds was the repayment of a loan previously made by Shaoul to a third party.

30.     On February 21, 2017, Shaoul withdrew $30,000 from the QHCI D&R Investments LLC account.

31.     On the same day, Shaoul deposited the same amount into Cluff's SunTrust Account with the intent that Cluff would deposit the funds into the 1784 Account and that Shaoul would then use the funds to purchase Mobileye call option contracts.

32.     On February 21, 2017, the combined ending balance in the three Wells Fargo checking accounts used by Shaoul to fund the 1784 Account totaled $13,383.05.

33.     On February 27, 2017, Shaoul called OX and identified himself as Roger Shaoul. He asked whether a $30,000 transfer had been deposited into the 1784 Account. The OX representative told Shaoul that the account was in Cluff's name and that Shaoul did not have authority to access the account. The OX representative told Shaoul that Shaoul did not have authority to know whether the inbound transfer was deposited into the account.

34.     The OX representative told Shaoul how he could obtain authority to access and trade in the 1784 Account. As a result of this conversation on February 27, Shaoul knew that he lacked authority from OX to trade in the account unless and until OX received and processed an authorization form.

35.     A wire transfer from Cluff's SunTrust Account of $28,000 posted to the 1784 Account the next day, February 28, 2017.

36.     On February 28, 2017, Cluff called OX and answered identity verification

questions posed by OX representatives.  Cluff asked questions about how to complete OX's

Limited Trading Authorization forms in order to give Shaoul authority to trade in the OX 1784

account.

       37.     On March 2, 2017, a person identifying himself as Cluff called OX and asked if

the Limited Trading Authorization forms to add Roger Shaoul had been processed.  OX said

Shaoul did not have authority, and the caller began placing trading instructions.  OX

representatives report that caller ID information for both the February 27 and March 2 calls

provided a telephone number that is associated with Shaoul, not Cluff.

       38.     As Shaoul admits, Shaoul impersonated Cluff during the March 2 calls with OX.

       39.     Shaoul continued to impersonate Cluff and directed the purchase of Mobileye

securities in the 1784 Account prior to the Announcement, as follows:

        a.    Between March 2 and March 10, 2017, the 1784 Account purchased 2,209

            Mobileye call options expiring March 10, March 17, and March 24 with strike

            prices ranging from $49 to $55.

        b.    On March 8, 2017, the 1784 Account sold 425 Mobileye shares for $19,920.43.

        c.    Between March 8 and March 10, the 1784 Account purchased approximately

            $20,000 in additional Mobileye call options expiring March 17 and March 24

            with strike prices ranging from $50 to $55.

       40.     Shaoul had never traded securities before 2017.

       41.     Shaoul does not understand the nature of option contracts and cannot explain

basic features of options contracts, including the significance of a strike price.

       42.     Shaoul purchased the call option contracts at the direction of his brother, Brother

A.  The direction from Brother A included the specific expiration dates, strike prices, and

purchase prices Shaoul should offer for each option contract.

43.    Shaoul developed no part of his trading strategy on his own and did not use any information other than the direction from Brother A as the basis for his trading.

44.    During the March 2, 2017, telephone conversations, an OX representative warned Shaoul that his trading strategy was illogical and suggested that Shaoul (who was impersonating Cluff) consult the source of his strategy.

45.    Shaoul ended the first call, the called Brother A to consult, and then called OX back the same day.  After consulting Brother A, Shaoul responded to the OX representative: "I'm going to tell you what you have to do, even if it doesn't make sense."

46.    Mobileye's daily closing price ranged from a low of $46.19 to a high, on March 10, of $47.27 during this time period.  Mobileye had last closed at or above $49 per share on August 23, 2016, and had not closed above $50.00 in the prior 17 months.

47.    These option trades carried a significant risk:  the options were approximately 4 percent to 19 percent out-of-the-money at the time they were bought and all expired within three weeks of purchase.

48.    As of close of trading on Friday, March 10, 2017, the last trading day prior to the Announcement, the 1784 Account held 3,414 Mobileye shares and 1,209 Mobileye call options with strike prices between $50 and $55.

49.    On March 13, 2017, after the Announcement, the 1784 Account sold 862 Mobileye call options for proceeds of $617,563.85.  The 1784 Account has seen realized gains of approximately $590,000 and unrealized gains of approximately $335,000, representing a total profit of approximately $925,000.

50.    In six weeks, the 1784 Account earned a return of 488% on the $189,500

deposited into the account.

51.     On March 16, 2017, $400,000 was wired out of the 1784 Account and into Cluff's SunTrust Account.  On March 25, 2017, an additional $150,000 was wired out of the 1784 Account and into Cluff's SunTrust Account.

52.     Defendants executed written loan agreements for each of the two transfers out of the 1784 Account, which treated the two transfers as short-term loans from Shaoul to entities controlled or connected to Cluff.  Pursuant to these written agreements, Shaoul expects these loans to be repaid with agreed upon 12% interest and 2 points in origination fees.

53.     The 1784 Account has a current balance of approximately $578,000.

54.     Shaoul signed an OX Full Trading Authorization application form multiple times: once on March 3, 2017, and again on March 8, 2017.  The Full Trading Authorization application form signed by Shaoul states that Shaoul (i) has ten years of stock trading experience, (ii) engages in 65 stock trades annually, (iii) has ten years of options trading experience, and (iv) engages in 75 options trades annually.

55.     Shaoul had no experience trading stocks or options at the time he signed the Full Trading Authorization application form.

56.     At the time he signed the Full Trading Authorization application form, Shaoul knew that the form grossly misrepresented his trading experience.

57.     The Full Trading Authorization application form signed by Shaoul also provides a "Social Security / Tax ID Number" for Shaoul that appears to be misleading.  At his deposition, Shaoul could not verify that the number was his and no publicly available documents are associated with the tax identification number provided for Shaoul in the Full Trading Authorization application form.

58.     Shaoul knew at the time that he traded in the 1784 Account that he lacked authority to do so.

59.     Shaoul admits that he concealed his identity from OX when accessing the 1784 Account because "I was not Larry."

60.     Cluff submitted a Full Trading Authorization application form to OX to grant Shaoul full trading authorization over his account on March 21, 2017.

61.     On April 1, 2017, defendants declined to provide additional information requested by OX in order to process the trading authorization request and abandoned their effort to obtain authority from OX to allow Shaoul to trade in the 1784 Account.

62.     At no point did Shaoul obtain authority from OX to trade in the 1784 Account.

**B.  Cluff Used the Long-Dormant 4866 Account in January 2017 to Trade in Mobileye.**

63.     Cluff opened the 4866 Account with OX in February 2006, and did not trade in the account for a six-year period prior to the first formal discussions between Intel and Mobileye in late January 2017.  The account held no securities immediately prior to the trading described below.

64.     The 4866 Account had no prior history of trading in Mobileye securities before January 30, 2017.

65.     Having never traded in Mobileye securities and after a six-year period of no trading whatsoever, Cluff began to accumulate Mobileye stock and options in the 4866 Account on January 30, 2017, when he purchased two shares of Mobileye stock.

66.     Two days later, Cluff transferred $5,000 into the 4866 Account from a bank account ending 3974 at SunTrust Bank (the "SunTrust Account").

- 12 -

67.     On February 3, Cluff purchased 110 Mobileye shares using the newly deposited cash and approximately $1,800 in borrowed margin from OX.

68.     The 4866 Account has seen realized and unrealized gains of $3,560.08.

69.     The 4866 Account has a current balance of approximately $8,700, and no withdrawals have been requested from the account.

**C.  Defendants' Trading was Unusual and Suspicious.**

70.     The trading in Defendants' accounts includes the following indicators of unusual and suspicious trading:

    a.  **<u>Timing.</u>**

       i.   Defendants had never traded in Mobileye securities prior to 2017;

      ii.   Defendants opened a new account specifically to trade in Mobileye securities on January 29, 2017, two days after discussions between Intel and Mobileye began in earnest;

     iii.   On the first business day after Cluff opened the 1784 Account, Shaoul essentially emptied three checking accounts to which he had access for the purpose of buying Mobileye shares;

     iv.   Two days later, on February 1, 2017, the same day Intel and Mobileye executed confidentiality and exclusivity agreements regarding the proposed transaction, Cluff funded the 1784 Account with $161,500 of Shaoul's money, and Shaoul directed that Cluff use all but $80 of that money to purchase Mobileye shares that day;

      v.   An additional $28,000 was wired into the 1784 Account on February 28, 2017, after the final, in-person meetings of Intel and Mobileye

principals and outside advisers, and two days after the Special

Committee of Mobileye's board of directors received an update on the

transaction;

vi.   At least as early as February 27, 2017, Shaoul knew that he lacked

authority from OX to trade in the 1784 Account.  Shaoul began the

process to obtain authority but did not wait to trade.  Instead, he

impersonated Cluff in order to purchase risky out-of-the-money call

options on March 2, 2017; and

vii.  On March 8, 2017, as Intel and Mobileye neared the Announcement,

Shaoul sold some Mobileye shares and immediately reinvested the

proceeds into riskier call options, some of which had strike prices 17%

out of the money and expiration dates of March 17.  In other words,

with just two business days until the Announcement, Shaoul bet that

the Mobileye share price would increase by at least 17% in nine days.

viii. As of March 10, 2017, the last trading day prior to the Announcement,

the 1784 Account held 3,414 Mobileye shares and 1,209 Mobileye call

options with strike prices between $50 and $55.

b.   **Relative Size of Investment**

i.    As Shaoul admits, Shaoul is a "man of modest means" who "lives

conservatively, paycheck to paycheck;"

ii.   Despite this conservative lifestyle, Shaoul withdrew 94.9% of his

assets to invest in Mobileye shares on January 30, 2017; and

iii.  On February 21, 2017, Shaoul withdrew 69.2% of his liquid net worth

at the time to invest in risky out-of-the-money Mobileye options.

c.  **Type of Transactions**

    i.  Shaoul had never purchased, sold, or traded any securities prior to the time he purchased Mobileye securities in 2017, let alone high-risk, out-of-the-money call options;

    ii.  Shaoul is an unsophisticated trader, and audio recordings of Shaoul's calls with OX demonstrate that he did not understand the call options he purchased or the trading strategy he executed;

    iii.  Shaoul purchased Mobileye call options that were anywhere from approximately 4 percent to 19 percent out-of-the-money at the time they were bought, and they all expired within three weeks or less of purchase; and

    iv.  The out-of-the-money call options purchased by Shaoul would have expired worthless but for the Announcement and the corresponding rise of the price of Mobileye shares.

d.  **Amount of Profits**

    i.  The 1784 and 4866 OX accounts earned a six-week return of approximately 488% on the $189,500 wired into the accounts in February 2017

e.  **Shaoul Lied to OX**

    i.  At all times that Shaoul purchased call options shortly before the Announcement, Shaoul knew that he lacked authority from OX to trade in the 1784 Account;

    ii.   Shaoul began to take the steps necessary to obtain authority but never completed the process;

    iii.   When Shaoul purchased options on March 2, Shaoul concealed his identity and caused OX to believe that he was Cluff;

    iv.   Toward the beginning of a call with OX on March 3, OX asked Shaoul if he was Cluff and Shaoul responded "yes."  Shaoul then traded options in the 1784 Account; and

    v.   Shaoul could have waited to obtain authority and then purchase Mobileye options later in March or April.  Shaoul's deceit betrays his urgency to trade before the Announcement and illustrates the risks Shaoul was willing to take to trade before the Announcement.  Indeed, he did not purchase securities of any company after the Announcement and abandoned his efforts to obtain authority from OX to do so.

**Defendants' Possession of, and Trading on, Material Nonpublic Information**

71.    Shaoul's trading in Mobileye securities was based solely on a tip of material nonpublic information from Shaoul's brother, Brother A.

72.    Brother A and Shaoul speak frequently and share a close sibling relationship.

73.    Shaoul told Cluff that his family knew Mobileye's founders.

74.    Cluff and Shaoul have been friends and business partners since 2008.  In January 2017, Shaoul provided Cluff with material nonpublic information and explained to Cluff that Mobileye's principals were recommending that their friends and family invest in Mobileye, thereby providing Cluff with material nonpublic information.

75.    When Cluff obtained material nonpublic information from Shaoul, he consciously

avoided learning that that the information had been disclosed in breach of a fiduciary duty or similar obligation of trust and confidence for a personal benefit.  Cluff did not ask Shaoul whether Mobileye permitted or approved trades based on the tip from Brother A.

76.     Cluff purchased Mobileye securities at least in part based upon the tip from Shaoul.

77.     Brother A gave Shaoul detailed directions to buy specific Mobileye options.  The directions included specific purchase prices, strike prices, and expiration dates.

78.     Brother A had never given Shaoul this type of direction in the past.

79.     Shaoul told Brother A of the size of Shaoul's investment in Mobileye and Brother A did not show concern.

80.     At the times that Brother A tipped Shaoul, Shaoul knew that Brother A had business and personal relationships with the founders of Mobileye and their families.

> a.  Brother A is one of only 35 investors in OrCam, a privately-held company also founded by Mobileye founders Directors A and B.

> b.  Brother A is a physician specializing in nonsurgical cosmetic procedures, including botox and laser hair removal.  He is a principal of the MLE Medical Laser clinic in Jerusalem, Israel.  Director A and his wife have received treatment at Brother A's clinic.

> c.  Director A and his wife, and Director B see Brother A and Brother A's family at periodic social gatherings.

> d.  In October 2016, Brother A purchased a used car from Director A. Director A does not appear to be in business of selling used cars to the public.

e.  In December 2016, Mobileye chartered a private airplane for executives to travel to Germany and Spain.  Director A offered four extra seats to his acquaintances, and Brother A and his wife accepted two of the available seats.

f.  Approximately two years ago, Brother A's wife, a nurse, provided occasional assistance to Director B's wife when she was ill.

g.  Brother A has four adult children who are friends with the late-adolescent and adult children of Directors A and B.  Director B's late-adolescent child attends the same school and is in the same class as one of Brother A's children.  Directors A and B informed their adult children, including the friends of Brother A's children, of Intel's interest in purchasing Mobileye prior to the Announcement.

81.  Shaoul also participated in a set of 2014 wire transfers that funded the purchase of Mobileye shares prior to the initial public offering.  Brother A purchased approximately $90,000 worth of Mobileye shares on his behalf in 2014 before the initial public offering.  Brother A was able to acquire shares of the privately held Mobileye only by virtue of a personal relationship to Mobileye.

82.  Shaoul also had a connection to Mobileye through another brother, referred to in this Complaint as "Brother B."  Brother B was a shareholder of Mobileye prior to Mobileye's 2014 initial public offering.  Brother B was able to acquire shares of the privately held Mobileye only by virtue of a personal relationship to Mobileye.

83.  Shaoul also has connections to Mobileye through his connection to HUJI.  Shaoul studied science at HUJI from 1972 to 1976.

84.     Members of HUJI developed Mobileye's technology.

85.     In 1964, HUJI established the technology transfer company Yissum Research Development Company ("Yissum") to protect and commercialize intellectual property developed in HUJI's research facilities.  Yissum is a for-profit entity wholly owned by HUJI.

86.     Mobileye's technology emerged from the Mobileye Chairman's academic research at HUJI.  Yissum commercialized the HUJI-developed technology and licensed it to Mobileye in 1999.  Yissum's website currently lists Mobileye as a subsidiary.  According to a July 14, 2014, Form F-1/A Mobileye filed with the Commission in connection with its initial public offering, Yissum owned 0.5 percent of Mobileye at the time of the offering.

87.     Many Mobileye directors and officers, including its two founders, are professors, alumni, or otherwise connected to HUJI, including:

- Director A has been a Professor of Computer Science at HUJI since 1996;

- Director C earned her M.A. in Psychology from HUJI and has been a member of HUJI's Executive Committee of the Board of Governors since 2006;

- Director D earned his B.A. in Economics and M.B.A. in Finance from HUJI;

- Director E earned his B.Sc. in Computer Science from HUJI;

- A Senior Vice President earned his Ph.D. from HUJI's Center of Neural Computation;

- A Senior Vice President earned his Ph.D. from HUJI's Institute of Computer Science;

- A Senior Vice President joined Mobileye while he was a student at HUJI's "Engineering, Intelligent Systems" program;

- A Vice President is an Associate Professor at HUJI's Rachel and Selim Benin School of Computer Science and Engineering;

- A Vice President earned his M.B.A. from HUJI;

- A Vice President earned his Ph.D. from HUJI's Center of Neural Computation; and

- A Vice President earned his B.Sc. in Computer Science from HUJI.

88.     At least ten of the Mobileye officers and directors identified above were aware of the non-public negotiations between Intel and Mobileye prior to the Announcement.

89.     Through his family's connections with Mobileye's founders and their families, and through his study in the sciences at HUJI, Shaoul has access to a network that could provide material nonpublic information concerning discussions between Intel and Mobileye.

90.     Directors A and/or B tipped their close friend and business partner Brother A with material nonpublic information about the pending tender offer.  Directors A and B owed a fiduciary duty or similar obligation of trust and confidence to Mobileye and its shareholders to keep the material nonpublic information confidential.

91.     Directors A and/or B breached a fiduciary duty or similar obligation of trust and confidence for a personal benefit by tipping the material nonpublic information to Brother A. Directors A and/or B received a personal benefit by making a gift of the inside information to Brother A, their close friend and business partner.  Directors A and/or B expected that the information being disclosed would be used in securities trading.

92.     Brother A knew or was reckless in not knowing that the information tipped by Directors A and/or B was material and nonpublic.  Given Brother A's personal and business relationships and communications with Directors A and B, Brother A knew, consciously avoided knowing, or was reckless in not knowing that Directors A and/or B had breached a duty a fiduciary duty or similar obligation of trust and confidence for a personal benefit.  At all times Brother A knew, consciously avoided knowing, or was reckless in not knowing that Directors A and B were directors and corporate insiders at Mobileye.

93.     Brother A tipped his brother Shaoul with material nonpublic information about the pending tender offer.  Shaoul knew or was reckless in not knowing that this information was material and nonpublic.  In light of, at least, Shaoul's knowledge that Brother A and his family had ongoing personal and business relationships with Directors A and B and their families, Shaoul's knowledge that Directors A and B were the founders and directors of Mobileye, and the fact that Shaoul did not ask Brother A questions about the source of information, Shaoul knew, consciously avoided knowing, or was reckless in not knowing that information tipped by Brother A was material nonpublic information disclosed in violation of a relationship of trust or in breach of fiduciary duty for a personal benefit at all times that Shaoul traded in Mobileye securities and tipped Cluff with material nonpublic information about the tender offer.  At all times Shaoul knew, consciously avoided knowing, or was reckless in not knowing that Directors A and B were directors and corporate insiders at Mobileye.

94.     At all times that Shaoul traded on the basis of material nonpublic information concerning the pending tender offer, Shaoul knew or had a reason to know that the material nonpublic information concerning the pending tender offer had been acquired by Brother A directly or indirectly from a Mobileye insider, namely Directors A and/or B.

95.     Shaoul tipped his friend and business partner Cluff with material nonpublic information about the pending tender offer.  Cluff knew or was reckless in not knowing that this information was material and nonpublic.  In light of, at least, the fact that Shaoul told Cluff that Shaoul's family members knew the principals of Mobileye who had recommended that their friends and family invest in Mobileye, and the fact that Cluff did not ask Shaoul questions about the source of information, Cluff knew, consciously avoided knowing, or was reckless in not knowing that information tipped by Shaoul was material nonpublic information disclosed in

violation of a relationship of trust or in breach of fiduciary duty for a personal benefit at all times that Cluff traded in Mobileye securities.  At all times Cluff knew, consciously avoided knowing, or was reckless in not knowing that Directors A and B were directors and corporate insiders at Mobileye.

96.     At all times that Cluff traded on the basis of material nonpublic information concerning the pending tender offer, Cluff knew or had a reason to know that the material nonpublic information concerning the pending tender offer had been acquired by Shaoul directly or indirectly from a Mobileye insider, namely Directors A and/or B.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

97.     The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

98.     By virtue of the foregoing, Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

99.     By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder
### (Against All Defendants)

100.    The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

101.    By virtue of the foregoing, Defendants, singly or in concert with others, in connection with a tender offer, directly or indirectly: (a) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) purchased or caused to be purchased securities or options to obtain securities while in possession of material information related to a tender offer which information Defendants knew or had reason to know was nonpublic and which Defendants knew or had reason to know had been acquired directly or indirectly from Intel or Mobileye or any officer director, partner, employee or any other person acting on behalf of Intel or Mobileye before such information and its source were publicly disclosed.

102.    By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3(a) thereunder [17 CFR § 240.14e–3(a)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a show cause order and an order temporarily and preliminary freezing Defendants' assets and enter a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3(a) thereunder [17 CFR § 240.14e–3(a)];

## II.

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

## III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

## IV.

Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.

Dated: June 6, 2017

                     *s/ Terry R. Miller*_____
Gregory A. Kasper
Terry R. Miller (*pro hac vice*)
James A. Scoggins, II (*pro hac* admission pending)
Stephen C. McKenna (*pro hac vice*)
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
millerte@sec.gov

scogginsj@sec.gov
mckennas@sec.gov

Alexander M. Vasilescu
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1100
vasilescua@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

**<u>Certificate of Service</u>**

       I hereby certify that on June 6, 2017, the document above was e-filed with the Court's ECF system and will be served on those listed below:

       Russell D. Duncan
       Paul R. Huey-Burns
       Shulman Rogers Gandal Pordy & Ecker, P.A.
       12505 Park Potomac Avenue - 6th Floor
       Potomac, MD 20854
       Telephone: (301) 9241
       Fax (301) 230-2891
       E-mail: phuey-burns@shulmanrogers.com
       rduncan@shulmanrogers.com

       *Counsel for Roger E. Shaoul*

       Steven S. Biss
       300 West Main Street, Suite 102
       Charlottesville, Virginia 22903
       Telephone: (804) 501-8272
       Facsimile: (202) 318-4098
       Email: stevenbiss@earthlink.net

       *Counsel for Larry D. Cluff, Jr.*

                                  _s/ *Scott Wesley*_____